IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

DANIEL MANCINA,

                                              Case No.:

      Plaintiff,

v.

TECOVAS, INC.,

      Defendant.

---

William R. Frush (P87016)
F&S Law, PLLC
Attorney for Plaintiff
77 Monroe Center St NW
Suite 600 - #1028
Grand Rapids, MI 49503
wfrush@fslawpllc.com
(248) 675-9192

---

**COMPLAINT**

NOW COMES Plaintiff DANIEL MANCINA ("Plaintiff"), by and through his attorney, F&S Law, PLLC, and hereby states his Complaint against Defendant TECOVAS, INC., (hereinafter "Defendant") as follows:

**NATURE OF ACTION**

This is an action for unlawful disability discrimination in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189, 28 C.F.R. Part 36, and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL 37.1101 et seq. Plaintiff seeks remedies under federal and

Michigan law for Defendant's failure to make its website accessible to individuals with disabilities. Plaintiff requests injunctive relief, compensatory damages, costs, and litigation expenses (including attorney's fees), as well as any other relief this Court deems fair and just.

## PARTIES

1.      Plaintiff DANIEL MANCINA ("Plaintiff") is a natural person and resident of Livingston County in the State of Michigan.

2.      Plaintiff has a determinable physical impairment that substantially limits one or more major life activities, i.e., the major life activity of seeing, due to Plaintiff's blindness. Plaintiff thus qualifies as a member of a protected class of individuals under the PWDCRA, MCL 37.1103(d).

3.      Plaintiff is also a member of a protected class of individuals under the ADA pursuant to 42 U.S.C. § 12102(1)-(2), and 28 C.F.R. §§ 36.101 et seq.

4.      As a result of his disability, Plaintiff relies on screen-reading software and other assistive technologies/software to access digital content, including websites and mobile applications, and obtain goods and services on equal terms with the non-disabled public.

5.      Plaintiff uses a computer program called VoiceOver to utilize the internet. VoiceOver is a built-in screen reader on macOS that provides auditory

F&S Law

2

descriptions of on-screen elements, permitting Plaintiff to navigate and interact with his computer (and the internet) using keyboard commands and spoken feedback.

6.      Defendant is a foreign for-profit corporation incorporated in the State of Delaware with a principal place of business located at 901 E 6th St, Suite 300, Austin, Texas 78702.

7.      Defendant's registered agent is Capitol Corporate Services, Inc., located at 1501 S Mopac Expy Ste 220, Austin, Texas 78746.

8.      Defendant is an American retailer of Western-style apparel. Defendant distributes its products throughout the United States and specifically in the State of Michigan through the direct-to-consumer component of its business as well as multiple in-person locations.

9.      Defendant's products are extended, offered, and sold to the Michigan public in places of public accommodation. Specifically, Defendant owns and operates a storefront at 1252 Woodward Ave, Detroit, MI 48226. Defendant also distributes its goods in Michigan via a partnership with Howell Western Wear, a separate Western-style store located at 121 N Michigan Ave, Ste A Howell, MI 48843.

10.     By manufacturing, distributing, and/or marketing its products for sale in places of public accommodation, Defendant directly participates in and benefits

from the privileges, advantages, and accommodations offered by the same places of public accommodation.

11.     At all relevant times, Defendant owned, maintained, operated and/or controlled the following website related to its places of business: www.tecovas.com (hereinafter "Website" or "the Website"). On the Website, Defendant advertises its products, promotes its brand, and facilitates online direct-to-consumer purchasing of Defendant's products and apparel.

12.     The Website enables customers to research Defendant's cowboy boots, jeans, and other inventory; compare product specifications and pricing, view product features and availability, read customer reviews, and access warranty information. Therefore, Defendant's Website is sufficiently connected to places of public accommodation such that there is a nexus between Defendant's Website and physical places of business in which Defendant's goods are sold.

13.     The Website serves as the principal gateway to the goods that Defendant extends, offers, and sells at and through other places of public accommodation and is itself an intangible privilege, advantage, and service connected to the same facilities. Defendant's Website functions as the primary means by which prospective customers can discover where Defendant's products are sold, research product specifications, access warranty information, and directly purchase Defendant's products online for delivery.

14.     By operating the Website as the primary online presence for its products and by distributing its goods through retail establishments that are indisputably places of public accommodation, Defendant is subject to and bound by the accessibility requirements mandated under the PWDCRA because it is a business whose goods, services, facilities, privileges, advantages, and/or accommodations are extended, offered, sold, or otherwise made available to the general public. MCL 37.1301(a).

15.     Defendant's Website is thus also a place of public accommodation under the PWDCRA, MCL 37.1301(a).

16.     By operating the Website as the primary online presence for its products and by distributing its goods through retail establishments that are indisputably places of public accommodation, Defendant is subject to and bound by the accessibility requirements mandated under Title III of the ADA, because Defendant's operations affect commerce in "a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment[.]" 42 U.S.C. § 12181(7)(E).

17.     Defendant has voluntarily entered the stream of commerce, places its branded products in places of public accommodation, and operates the Website as the primary digital interface for consumers to access information about and purchase those products. Title III's requirements extend to all aspects of Defendant's

commercial operations that affect access to places of public accommodation, including the digital gateway through which consumers discover and purchase Defendant's goods.

18.     Defendant's Website is thus a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7)(E).

## JURISDICTION AND VENUE

19.     Plaintiff incorporates by reference paragraphs 1 through 18 as if fully stated herein.

20.     This Court has original jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. § 1331(a): "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

21.     This Court has supplemental jurisdiction over Plaintiff's PWDCRA claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiff's ADA claims that they form part of the same case or controversy.

22.     Venue is proper in the United States District Court for the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to this claim occurred. Plaintiff accessed Defendant's Website from his residence

F&S Law

6

in Michigan, and Defendant conducts substantial business in Michigan through the sale of its products at retail establishments throughout the state.

## FACTUAL BACKGROUND

23.     Plaintiff incorporates by reference paragraphs 1 through 22 as if fully stated herein.

24.     On February 10, 2026, Plaintiff visited Defendant's Website to browse and purchase a candle for his wife.

25.     Plaintiff encountered several accessibility errors present on Defendant's Website that prevented Plaintiff from being able to appropriately navigate, use, or complete an order on Defendant's Website.

26.     Defendant's Website contains a navigation menu designed to help users move through the site's content. For blind users relying on screen-reading software, such a menu is particularly important: it allows them to jump between sections of a page without having to listen to every intervening element read aloud in sequence. When a navigation menu is properly coded, Plaintiff's screen reader announces it and reads its options by name, allowing Plaintiff to select a destination and proceed independently.

27.     When Plaintiff attempted to access the navigation menu on Defendant's Website, his screen reader announced the menu's presence but read no options within it. The menu was, in functional terms, empty—it existed in the website's underlying

structure but contained no labeled, selectable items that Plaintiff's screen reader could identify or announce. Specifically, Defendant's Website contains navigation links that have no text or descriptive label associated with them, leaving Plaintiff's screen reader with nothing to read aloud.

28.     This failure occurs because the links comprising the navigation menu were programmed without any readable content: no visible text, no descriptive label, and no alternative identification that screen-reading software can detect and communicate to the user. A properly coded navigation link contains a name or label that tells the user where the link leads. Defendant's navigation links contain none of these, causing Plaintiff's screen reader to either skip them silently or announce a meaningless placeholder.

29.     As a result, Plaintiff was unable to use the navigation menu for its intended purpose. He could not determine what sections of the Website were available, could not select a product category to browse, and could not orient himself within the site's structure. The navigation menu that sighted visitors use instinctively, glancing at it and clicking, was entirely unavailable to Plaintiff. He was left to attempt to navigate the Website without the basic wayfinding tool Defendant had placed on the page for that purpose.

30.     The navigation links described above violate two foundational requirements of the Web Content Accessibility Guidelines ("WCAG") at their most

basic level of compliance. First, each interactive element on a website, including navigation links, must carry a name that assistive technology can read and announce to the user. Defendant's navigation links carry no such name, in violation of WCAG 2.1 Success Criterion 4.1.2. Second, a user must be able to determine the purpose of any link, where it leads or what it does, either from the link's label or from the surrounding context. Because Defendant's navigation links are entirely unlabeled, Plaintiff could determine neither, in violation of WCAG 2.1 Success Criterion 2.4.4. Both criteria are Level A requirements — the most fundamental tier of accessibility, representing the minimum below which a website is considered unusable for certain users. Defendant's navigation menu fell below that minimum.

31.     Defendant's Website displays rotating image carousels, a common feature that cycles through a series of promotional images or product highlights. For sighted users, these carousels are navigated visually: the images are large and prominently displayed, and navigation dots or arrows are easily identified and clicked to move between slides. For a blind user relying on a screen reader, the carousel must instead communicate its content through text; specifically, each slide and its navigation controls must carry a label that tells the user what that slide contains and where it will take them.

32.     When Plaintiff encountered Defendant's carousels, his screen reader announced the presence of navigation controls for the slides, but read only positional

information: "Slide 1," "Slide 2," "Slide 3," continuing through nine slides. No other information was provided. The announcements told Plaintiff only that slides existed and how many there were: not what any slide depicted, what product or promotion it featured, or where activating the link would take him.

33.    This occurred because Defendant's carousel navigation links were programmed with labels that describe position only, rather than content. A properly coded carousel link tells the user something meaningful. For example, "Men's Western Boots — Shop Now" or "New Arrivals — See Collection." Defendant's links communicated nothing of the kind. From Plaintiff's perspective, navigating the carousel was the equivalent of being handed nine identical, unlabeled envelopes and told only that they were numbered.

34.    Plaintiff also encountered an announcement stating "you are currently in a carousel" as his screen reader moved through the page. While notifying a user that a carousel region is present is a recognized practice, that notification does not substitute for labeling the carousel's individual slides. Plaintiff was informed he was inside a carousel; he was given no information about what the carousel contained. The net effect was that Plaintiff understood he was navigating a promotional or informational section of the Website but could not access any of the information within it.

35.     The carousel navigation described above violates a foundational requirement of the WCAG at their most basic level of compliance. A website must ensure that any user can determine the purpose of a link, where it leads or what it will show, either from the link's text or the context surrounding it. Defendant's carousel navigation links communicate only position: they tell Plaintiff he is on slide one, or slide two, or slide three. They say nothing about what those slides contain or where activating them leads. That failure violates WCAG 2.1 Success Criterion 2.4.4, a Level A requirement representing the minimum threshold below which a website is considered unusable for certain users. Plaintiff could navigate Defendant's carousel numerically. He could not navigate it meaningfully.

36.     On a product page, the single most important function available to a customer is the ability to add an item to their cart and proceed toward purchase. For a blind user navigating by screen reader, that function depends entirely on the "Add to Cart" button being reachable by keyboard and identifiable by name. A properly coded button carries a clear label: "Add to Cart," that a screen reader announces when the user reaches it, allowing the user to activate it and continue. Without that label, the button is functionally invisible to a blind user regardless of where it appears on the page visually.

37.     When Plaintiff attempted to locate the Add to Cart button on Defendant's product pages, his screen reader did not clearly identify it among the

surrounding page elements. Navigating through the product images and controls that surround the button, Plaintiff repeatedly found himself unable to isolate and activate it. He spent approximately thirty minutes on his own attempting to complete this task on a prior visit to the Website, an additional twenty minutes during a subsequent guided audit, and was unable to successfully locate and activate the button on either occasion.

38.     Compounding this difficulty, Plaintiff's navigation was repeatedly interrupted by a focus displacement problem on Defendant's product pages. As Plaintiff moved through page elements using his keyboard, certain links on the page, links that appear functional but point to destinations that do not exist, caused his screen reader's focus to snap back to the top of the page. Each time this occurred, Plaintiff was required to begin navigating downward through the page again from the beginning, re-encountering all prior elements before reaching the point where he had been. This did not happen once. It happened repeatedly throughout his attempts.

39.     The experience was not one of gradual progress frustrated by confusion. It was one of repeated, involuntary displacement. Each time Plaintiff neared the area of the page where the Add to Cart button was located, he risked being thrown back to the start. The combination of an insufficiently labeled button and an unpredictable focus environment made the core commercial function of Defendant's Website,

purchasing a product, effectively unavailable to Plaintiff despite his sustained, good-faith effort over the course of nearly an hour across two sessions.

40.     The barriers described above violate two foundational requirements of the WCAG at their most basic level of compliance. First, every interactive control on a website, including buttons, must carry a name that assistive technology can identify and announce. Where a button's label is absent or insufficient to convey its purpose, a blind user cannot determine what the control does or whether it is the control they are looking for, in violation of WCAG 2.1 Success Criterion 4.1.2. Second, when a user navigates a webpage using only a keyboard, focus must move in a predictable, logical sequence. It must not be involuntarily displaced to an unrelated location. Defendant's broken anchor links caused Plaintiff's focus to reset to the top of the page without warning and without Plaintiff's direction, in violation of WCAG 2.1 Success Criterion 2.4.3. Both are Level A requirements. Together, they rendered the most essential function on Defendant's product pages unreachable.

41.     When a customer searches for a product on Defendant's Website, the results page displays two types of content: a set of filters allowing the customer to narrow results by size, color, price, and similar attributes, and the search results themselves. For a sighted user, these elements appear on screen simultaneously. The sighted user takes in the page at a glance, decides whether to apply a filter or proceed

directly to the results, and acts accordingly. The choice of where to direct attention is the user's to make.

42.    For Plaintiff, navigating by screen reader, that choice was not available. Defendant's Website is structured such that the filter panel appears before the search results in the order that screen-reading software reads the page. Because Plaintiff navigates sequentially, moving through elements one at a time as his screen reader announces them, he was required to pass through every filter option applicable to his search before his screen reader reached the first search result. He could not glance past the filters to the results; he had to move through the filters to get there.

43.    Defendant's Website provides no mechanism allowing Plaintiff to bypass the filter panel and jump directly to the search results. A properly structured results page includes a skip link or equivalent feature that allows keyboard and screen reader users to advance past large blocks of navigational content, such as an extensive filter panel, and proceed directly to the page's main content. Without such a mechanism, blind users are subject to a navigational burden that does not exist for sighted users and that grows more pronounced the more filters a given search generates.

44.    Plaintiff did not describe this barrier as one that made the Website completely unusable, but its effect was real: it imposed a consistent, involuntary tax on every search Plaintiff attempted, requiring him to spend additional time and effort

on a navigational detour that sighted users bypass without a second thought. Each product search required Plaintiff to work harder than a non-disabled user to reach the same starting point. That disparity, not inability, but unequal effort, is itself a form of discriminatory access.

45.     The barrier described above violates a foundational requirement of the WCAG at their most basic level of compliance. Where a webpage contains a block of content, such as a filter panel, that must be traversed before a user can reach the page's primary content, the website must provide a mechanism allowing users to bypass that block. This requirement exists precisely to ensure that blind and keyboard-dependent users are not forced to navigate through large sections of secondary content every time they attempt to reach what they came for. Defendant's search results pages provide no such mechanism, in violation of WCAG 2.1 Success Criterion 2.4.1, a Level A requirement. The absence of this feature does not render the Website completely inaccessible, but it renders it measurably and unnecessarily harder to use for Plaintiff than for a sighted visitor performing the identical task.

46.     Independent automated testing of Defendant's Website, conducted using two separate accessibility scanning tools, identified twelve or more instances of links throughout the Website that carry no readable name or label. These are not limited to the navigation menu Plaintiff encountered directly. They appear across

F&S Law

multiple pages of Defendant's Website, in multiple functional contexts, as a recurring feature of how the Website was built.

47. A link without a readable name presents a screen reader user with one of two outcomes: the screen reader either skips the link entirely, leaving the user unaware it exists, or announces it in a way that conveys no useful information: reading out a raw web address, an empty string, or nothing at all. In either case, the user cannot make an informed decision about whether to activate the link, because the link has not been given the basic identifying information that makes that decision possible.

48. The recurrence of this failure across multiple pages and contexts indicates that the absence of readable link names is not the result of an isolated coding error on a single page. It reflects a pattern in how interactive elements were designed and deployed across Defendant's Website, one that systematically disadvantages blind users at every point where an unnamed link appears, regardless of what page they are on or what task they are attempting to complete.

49. This pattern violates WCAG 2.1 Success Criterion 4.1.2, a Level A requirement, which mandates that all user interface components, including links, carry a name that assistive technology can read and communicate to the user. The two independent automated scans confirming this failure across Defendant's Website establish that it is not incidental. It is structural.

16

50.     Throughout Defendant's Website, including on the homepage and across numerous product and category pages, video content is programmed to begin playing automatically when the page loads and to continue playing on a continuous loop. This occurs without any action by the user. For a sighted visitor, an auto-playing video is at most a minor annoyance, easily ignored. For a blind user navigating by screen reader, it is a direct interference with the primary tool they depend on to use the Website at all.

51.     Screen-reading software works by reading aloud the text and labeled elements on a page. When a video plays automatically in the background, its audio competes directly with the screen reader's voice. The user hears two audio streams simultaneously—the screen reader attempting to announce page elements and the video's audio playing beneath or over it. The result is that the screen reader's announcements become difficult or impossible to follow, and the user's ability to understand and navigate the page is directly degraded for as long as the video continues to play.

52.     The solution to this problem is straightforward and well established: provide the user with a mechanism to pause, stop, or mute the video. A simple pause control, reachable by keyboard, allows a blind user to silence the video before attempting to navigate the page. Defendant's auto-playing videos provide no such

control. They begin without the user's direction and continue without offering the user any means to stop them.

53.     This failure was identified by automated testing on the homepage and on a significant number of Defendant's product and category pages, establishing that it is not confined to a single location. It is a sitewide characteristic of how Defendant has chosen to present video content, and one that imposes a consistent, predictable burden on every blind user who visits any of the affected pages. This violates WCAG 2.1 Success Criterion 2.2.2, a Level A requirement, which mandates that any moving or auto-playing content lasting more than five seconds must provide the user with a mechanism to pause, stop, or hide it. Defendant's Website provides none.

54.     Defendant's Website contains numerous links that are programmed to navigate a user to a specific location within a page, a feature commonly used to allow users to jump directly to a section of content without scrolling through everything above it. For blind users navigating by screen reader and keyboard, this type of link is particularly useful: it allows efficient movement through long pages by jumping to named destinations rather than traversing every intervening element. For this feature to work, however, the destination the link points to must actually exist on the page.

55.     Automated testing of Defendant's Website identified multiple links of this type whose destinations do not exist. The links appear functional, they are

present in the page, reachable by keyboard, and capable of being activated. But when a user activates them, the page has no corresponding destination to navigate to. Instead of landing the user at the intended section, the link deposits focus at the top of the page, the same position the user started from, without warning and without explanation.

56.     For a sighted user, activating a broken anchor link may produce a barely perceptible effect: the page does not scroll, and the user simply tries something else. For a blind user navigating sequentially by keyboard, the effect is disorienting and costly. The user has no visual reference to confirm that nothing happened. Their screen reader's focus has moved, but to the top of the page rather than forward. The user must then re-navigate downward through all previously traversed elements to return to approximately where they were, with no reliable way to identify which link caused the displacement or whether it will happen again.

57.     This failure was identified across the homepage and multiple additional pages, establishing it as a recurring structural defect rather than an isolated error. It directly corroborates Plaintiff's experience attempting to locate and activate the Add to Cart button, during which his focus was repeatedly displaced to the top of the page—an experience that automated testing now confirms was caused by specific, identifiable broken links embedded in the pages he was attempting to navigate. This pattern violates WCAG 2.1 Success Criterion 2.4.3, a Level A requirement, which

mandates that keyboard focus move through a webpage in a sequence that is logical, predictable, and consistent with the page's meaning and structure. Defendant's broken anchor links produce the opposite: focus movement that is arbitrary, disorienting, and bears no relationship to the user's intended direction of travel.

58.     On Defendant's product and category pages, certain features and specifications are presented in a tabbed interface, a design pattern in which a row of selectable tabs allows the user to switch between different panels of content. For sighted users, this interface is intuitive: tabs are visible, clickable, and the selected panel's content appears below. For a blind user navigating by screen reader, a tabbed interface must be properly structured in the underlying code so that the screen reader can identify the tabs as tabs, announce how many there are, indicate which is currently selected, and allow the user to move between them using standard keyboard commands.

59.     Automated testing of Defendant's product pages identified tabbed interfaces that are improperly structured in their underlying code. Specifically, the containers that are designated as tab groups contain the wrong type of elements; rather than holding the tab controls a screen reader expects to find, they contain content elements of a different kind entirely. The result is that a screen reader attempting to navigate these interfaces encounters a structural mismatch: it is told it

F&S Law

has entered a tab group, but the contents do not conform to what a tab group is supposed to hold.

60.     The practical consequence for a blind user is significant. When a tab interface is properly coded, a screen reader announces the group, identifies each tab by name, and allows the user to move between tabs and their corresponding content panels using predictable keyboard commands. When the structure is broken, those commands do not work as expected. The user may be unable to identify what tabs are available, unable to determine which tab is currently active, or unable to navigate between panels at all, effectively locking them out of whatever content those panels contain.

61.     This failure was identified on multiple product and category pages, including pages dedicated to Defendant's work boots and western wear collections, establishing that it affects the pages where purchasing decisions are most directly made. Two independent testing tools reached the same finding, confirming it is not a testing artifact but a genuine structural defect. This violates WCAG 2.1 Success Criterion 1.3.1, a Level A requirement, which mandates that the structure and relationships conveyed visually on a webpage, including the organization of tabbed interfaces, must be programmatically determinable, meaning that assistive technology must be able to read and communicate that structure accurately to the

user. Defendant's tabbed product interfaces cannot be read accurately, because they were not built accurately.

62.     WCAG guidelines are divided into levels of compliance: Level A (pages with Level A issues are unusable for some people); Level AA (pages with Level AA issues are very difficult to use); and Level AAA (pages with Level AAA issues can be difficult to use).

63.     Websites are generally expected to maintain compliance with WCAG 2.1 Level AA or higher to be considered accessible. Level A issues—issues that are unusable for some people—are unacceptable as they prevent proper use of a website.

64.     The WCAG 2.1 Level A issues experienced by Plaintiff prevented him from perceiving and navigating Defendant's Website in an understandable or robust way. Defendant's Website presented with errors that are unusable for some people, including Plaintiff. This was confirmed during Plaintiff's visit to Defendant's Website, as the accessibility errors prevented him from browsing or researching products or completing a purchase on Defendant's Website.

65.     The identified accessibility errors are not theoretical or technical irregularities. They are not subjectively open to interpretation. Defendant's Website presented objectively verifiable and determinable errors that violate WCAG 2.1 Level A guidelines, representing the most severe type of accessibility errors that render websites unusable.

66.     The identified WCAG 2.1 Level A violations directly interfered with Plaintiff's ability to locate, understand, and utilize the information necessary to research products and complete a purchase on Defendant's Website, thereby denying Plaintiff full and equal access to Defendant's goods and services in violation of the PWDCRA and Title III of the ADA.

67.     Plaintiff was familiar with Defendant's products before visiting the Website. Several months prior to the events described herein, Plaintiff and his wife had visited one of Defendant's retail locations in person and purchased a candle that his wife enjoyed. When the candle was depleted, Plaintiff sought to purchase a replacement independently, on his own, without assistance, through the Website Defendant operates for exactly that purpose. That ability to independently return to a brand and repurchase a product one's family enjoys is something sighted customers exercise without a second thought. For Plaintiff, it required navigating Defendant's Website with a screen reader.

68.     Plaintiff was unable to complete that task. Despite sustained effort, including approximately thirty minutes spent on his own before the manual audit and an additional twenty minutes during it, Plaintiff could not locate and activate the Add to Cart function, could not navigate the product pages without being repeatedly displaced to the top of the page, and ultimately abandoned the attempt entirely. He did not purchase the candle. He did not purchase anything. The independence he

sought, the simple ability to go online and replace something his wife liked, was not available to him on Defendant's Website.

69.     The practical consequence of Defendant's inaccessible Website was not abstract. Plaintiff was denied the ability to complete a routine consumer transaction that any sighted visitor to the same Website could have completed in minutes. He could not browse Defendant's product offerings, could not identify the specific item he was looking for, and could not proceed to checkout. The Website that Defendant holds open to the public as its primary retail channel was, for Plaintiff, effectively closed.

70.     The dignitary harm Plaintiff suffered was equally real. Plaintiff is a returning customer, someone who had already chosen to spend money with Defendant and wished to do so again. The Website's failures did not merely inconvenience him. They communicated, through every unlabeled link and every involuntary displacement back to the top of the page, that the experience Defendant had designed was not designed for him. Plaintiff became visibly frustrated in his attempts to use the Website. That frustration was not impatience, it was the accumulating weight of being made to feel like an afterthought on a platform that sighted customers navigate with ease.

71.     Plaintiff was ultimately forced to choose between abandoning the purchase entirely or seeking sighted assistance to complete a transaction he wished

to complete on his own. That choice—giving up rather than asking for help—reflects the particular indignity that inaccessible websites impose on blind users: not just the loss of a transaction, but the loss of the independence that Defendant's Website offers everyone else as a matter of course. Requiring Plaintiff to depend on the assistance of another person to do what sighted customers do alone is itself a form of unequal treatment that the ADA and PWDCRA exist to prohibit.

72.   Plaintiff is a disabled individual who is interested in patronizing Defendant and intends to return to and access the Website once the Website's access barriers are removed or remedied. Plaintiff will continue to be denied equal access to Defendant's Website unless and until Defendant is compelled to bring the Website into compliance with applicable accessibility standards

## COUNT I – VIOLATION OF THE PWDCRA

73.   Plaintiff incorporates by reference paragraphs 1 through 72 as if fully stated herein.

74.   Plaintiff is an individual with a visual impairment that substantially limits a major life activity and qualifies as a disability within the meaning of the PWDCRA.

75.   The PWDCRA guarantees the opportunity to obtain the "full and equal utilization of public accommodations" without discrimination as a civil right. MCL 37.1102(1).

F&S Law

76.    A place of public accommodation means a business, educational institution, refreshment, entertainment, recreation, health, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. MCL 37.1301(a).

77.    Defendant's business is a place of public accommodation under the PWDCRA because Defendant is a business whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. MCL 37.1301(a).

78.    Defendant's Website is also a place of public accommodation under the PWDCRA because it provides the general public with the ability to locate and learn about Defendant's goods and products, provides direct-to-consumer purchasing of Defendant's goods and products, and features a Store Locator that connects consumers to the physical places of public accommodation in which Defendant's goods are sold. The Website is thus an extension of, gateway to, and an intangible "service, privilege, and advantage" of the many physical places of public accommodation at and through which Defendant's goods and products are sold. MCL 37.1302(a).

79.    The PWDCRA expressly states:

> except where permitted by law, a person shall not…deny an individual the full and equal enjoyment of the goods, services,

facilities, privileges, advantages, and accommodation of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids (e.g., screen-reading software). MCL 37.1302(a).

80.     Defendant's Website functions as an essential gateway to places of public accommodation because it is the primary means by which prospective customers, including Plaintiff, can access information regarding Defendant's goods and products, discovering not only where they are sold but also providing a direct outlet to purchase the goods directly on the Website.

81.     Defendant's Website is designed, constructed, managed, operated, and/or maintained in a manner that is inaccessible to Plaintiff and other similarly situated individuals because it is not compatible with commonly used screen-reader software. The accessibility errors on Defendant's Website make the goods and products offered therein unavailable to Plaintiff.

82.     Defendant's Website contains specific, remediable barriers that contravene widely recognized accessibility standards as identified in detail above. The accessibility barriers directly denied Plaintiff the full and equal enjoyment of Defendant's goods and products by materially burdening tasks that sighted users can perform routinely.

83.     Plaintiff attempted to use Defendant's Website on February 10, 2026. Because of the accessibility errors described in detail above, Plaintiff was precluded from browsing Defendant's products or completing an order on Defendant's Website based on his disability. This constituted an unlawful denial of equal access to Defendant's goods and products.

84.     As a direct and proximate result of Defendant's unlawful denial of equal access, Plaintiff has been denied the full and equal enjoyment of Defendant's goods and products. Plaintiff has suffered and continues to suffer both economic and dignitary harms. Plaintiff was unable to independently complete an order on Defendant's Website, forcing Plaintiff to either abandon the purchase entirely or surrender the independence that Defendant's Website extends to sighted customers. As a result, Plaintiff experienced significant emotional distress, frustration, humiliation, embarrassment, and a deepened sense of social exclusion. Defendant's refusal to provide an accessible website has reinforced and exacerbated Plaintiff's sense of segregation and exclusion, intensifying the dignitary harms flowing from his disability.

85.     The PWDCRA applies to all aspects of the provision of goods and services by a place of public accommodation, including the use of digital platforms when those digital platforms are directly connected to the corresponding physical facilities and are essential to accessing and utilizing the facilities' services.

86.     Plaintiff is entitled to monetary relief for emotional injuries and reasonable attorney's fees under MCL 37.1606 as a result of Defendant's denial of equal access.

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

     A.  Damages for the dignitary harms, emotional distress, frustration, humiliation, embarrassment, loss of independence, and exacerbated feelings of segregation and exclusion Plaintiff has suffered and continues to suffer as a direct result of Defendant's unlawful denial of equal access;

     B.  An award of reasonable attorney fees, costs, and litigation expenses;

     C.  Pre- and post-judgment interest;

     D.  Any other relief as the Court deems fair and just.

## COUNT II – VIOLATION OF THE ADA

87.     Plaintiff incorporates by reference paragraphs 1 through 86 as if fully stated herein.

88.     The Americans with Disabilities Act of 1990 ("ADA") identifies a wide range of businesses as public accommodations, including retail establishments and other locations where consumer goods are offered for sale, including a "grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment[s]." 42 U.S.C. § 12181(7)(E).

89.     Defendant is subject to the accessibility requirements of the ADA because Defendant has placed and sells its goods in retail establishments and profits from the general public.

90.     Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

91.     Defendant's Website is covered under Title III of the ADA because it provides the general public with the ability to locate and learn about the physical places of business at and through which Defendant's goods and products are sold. The Website is an extension of, gateway to, and intangible "service, privilege, and advantage" of the same physical locations, and is therefore a covered service of a place of public accommodation under 42 U.S.C. § 12182(a).

92.     Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that are equal to the opportunities afforded to other non-disabled individuals.

93.     Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

94.     In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps, as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden."

95.     Defendant's non-compliant Website denies blind and visually impaired individuals full and equal access to, and enjoyment of, the goods, information, and services that Defendant has made available to the public on the Website and in its physical locations in violation of 42 U.S.C. §12101, *et seq*, and as prohibited by 42 U.S.C. §12182, et seq.

31

96.    Defendant has made insufficient material changes or improvements to the Website to enable its full and equal use and enjoyment by, and accessibility to, blind and visually disabled persons such as Plaintiff.

97.    Violations may be present and on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

98.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other business entities in making their websites accessible. Incorporating basic accessibility improvements as described in WCAG 2.1 AA would neither fundamentally alter the nature of Defendant's business nor would they result in an undue burden on Defendant.

99.    Defendant's Website is substantially noncompliant with internationally accepted guidelines regarding digital accessibility and, as a result, fails to be perceivable, operable, robust, understandable, or accessible by blind and/or visually disabled individuals such as Plaintiff.

100.   Defendant has and continues to violate the ADA by denying access to the Website by individuals such as Plaintiff with visual disabilities who require the assistance of screen reader software to comprehend and access internet websites. The violations within the Website are ongoing.

F&S Law

101.   Part 36 of Title 28 of the C.F.R. was designed and implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the accessibility standards established by Part 36.

102.   Defendant's Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication and thus violates the ADA.

103.   Regulatory guidance confirms that Title III specifically requires that places of public accommodation provide effective communication via auxiliary aids and services to individuals with disabilities. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems."

104.   28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

105.   Public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities: "In order to be effective, auxiliary aids and services must be provided in

accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

106.  As a direct and proximate result of Defendant's failure to provide an ADA-compliant Website with a nexus to its brick-and-mortar locations, Plaintiff has suffered an injury-in-fact by being denied full and equal access to, and enjoyment of, Defendant's Website and the corresponding physical facilities. Plaintiff has experienced dignitary and emotional harms, including frustration, humiliation, and loss of independence. Because of the inadequate development and administration of the Website, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 to remedy the ongoing disability discrimination.

107.  This Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief.

108.  Plaintiff is entitled to recover his reasonable attorney's fees, costs, and expenses pursuant to the ADA.

WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendant for the following relief:

   a. A permanent injunction to prohibit Defendant from violating the Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq.;

   b. A permanent injunction requiring Defendant to take the steps necessary to make its Website fully compliant with the requirements set forth in the ADA and its

F&S Law

implementing regulations, so that the Website is readily accessible to and usable by blind individuals;

c. An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

d. Such other and further relief as this Court deems fair and just.

March 6, 2026

/s/ William R. Frush
F&S Law, PLLC
77 Monroe Center St. NW Suite 600
Grand Rapids, MI 49503
(248) 675-9192
wfrush@fslawpllc.com
P87016

F&S Law